UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

QUENTIN S. NASH,                              :      Case No.: _____
                                             :
            Plaintiff,                        :      **COMPLAINT**
                                             :
      -against-                               :      **DEMAND FOR JURY TRIAL**
                                             :
MOBILEIRON, INC., SIMON                       :
BIDDISCOMBE, TAE HEA NAHM, JESSICA            :
DENECOUR, KENNETH KLEIN, JAMES                :
TOLONEN, ANJALI JOSHI, and RISHI              :
BAJAJ,                                        :
                                             :
            Defendants.                       :
------------------------------------- X

       Plaintiff, Quentin S. Nash ("Plaintiff"), by the undersigned attorneys, for this complaint

against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon

information and belief based upon, *inter alia*, the investigation of counsel, as to all other

allegations herein, as follows:

## <u>NATURE OF THE ACTION</u>

       1.     This is an action brought by Plaintiff against MobileIron, Inc. ("MobileIron" or the

"Company") and the members of the Company's board of directors (collectively referred to as the

"Board" or the "Individual Defendants" and, together with MobileIron, the "Defendants") for their

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission

("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the

proposed merger (the "Proposed Transaction") of MobileIron and Ivanti, Inc. ("Ivanti").

       2.     On or about September 28, 2020, MobileIron announced that it had entered into an

agreement and plan of merger, pursuant to which MobileIron would merge with and into Ivanti

1

(the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, MobileIron's shareholders would be entitled to receive $7.05 per share in cash for each share of MobileIron common stock they owned (the "Merger Consideration").

3.  On or about October 14, 2020, in order to convince MobileIron's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4.  In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by MobileIron's financial advisors, Barclays Capital Inc. ("Barclays" or the "Financial Advisors") regarding the Proposed Transaction.

5.  The Proposed Transaction is expected to close in the fourth quarter of 2020 or the first quarter of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is forthcoming. Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

6.  For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to MobileIron's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, MobileIron's securities trade on the Nasdaq Global Select Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of MobileIron common stock.

11.     Defendant MobileIron is a Delaware corporation with its principal executive offices located at 490 East Middlefield Road, Mountainview California 94043.  The Company's common stock trades on the Nasdaq under the ticker symbol "MOBL."

12.     Defendant Simon Biddiscombe ("Biddiscombe") is, and has been at all relevant times, the Company's Chief Executive Officer and a director of the Company.

13.     Defendant Tae Hea Nahm ("Nahm") is, and has been at all relevant times, the Chairman of the Board of Directors of the Company.

14.     Defendant Jessica Denecour ("Denecour") is, and has been at all relevant times, a director of the Company.

15.     Defendant Kenneth Klein ("Klein") is, and has been at all relevant times, a director of the Company.

16.     Defendant James Tolonen ("Tolonen") is, and has been at all relevant times, a director of the Company.

17.     Defendant Anjali Joshi ("Joshi") is, and has been at all relevant times, a director of the Company.

18.     Defendant Rishi Bajaj ("Bajaj") is, and has been at all relevant times, a director of the Company.

19.     The Defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

20.     MobileIron is a publicly traded Delaware corporation and software company that provides unified endpoint and enterprise mobility management for mobile devices, such as multi-factor authentication, and was a pioneer in mobile security and management for smartphones and tablet computers.  MobileIron is an established player in the zero trust security solutions market, and a leader in mobile-centric, zero trust solutions that go beyond traditional approaches to security by utilizing a more comprehensive set of attributes to grant secure access.  MobileIron products and services validate the device, establish user context, check application authorization, verify the network, and detect and mitigate threats before granting secure access to a device or user. MobileIron's common stock trades on the Nasdaq under the ticker symbol "MOBL."

21.     Prior to the announcement of the Proposed Transaction, MobileIron had excellent growth prospects.

22.     For example, on July 29, 2020, just a few months before the Proposed Transaction was announced, MobileIron issued a press release entitled *MobileIron Announces Second Quarter 2020 Results* that announced that the Company was poised for continued and sustained growth thanks, in part, to the COVID-19 pandemic, which helped make "clear that the age of the Everywhere Enterprise is dawning," that would provide additional opportunities for MobileIron's growth, stating in part:

> "In the face of the hurdles brought on by the pandemic, our team's focus and execution enabled us to grow second quarter revenue by 16% and report record non-GAAP operating margin of 9.4%. Beyond our financial accomplishments, we continued to demonstrate the leading innovation that makes MobileIron the most robust mobile-centric security platform by introducing the first multi-vector, mobile phishing protection to defend against these prominent cybersecurity threats," said Simon Biddiscombe, CEO, MobileIron. "As remote work becomes an increasing part of many companies' future plans, it is clear that the age of the

Everywhere Enterprise is dawning, where customers, workers, and infrastructure will need to converge seamlessly and securely from anywhere to connect. ***This new normal brings with it an increasingly complex set of security demands and we are confident that our comprehensive set of offerings are uniquely positioned to meet these challenges***."

23.     Thus, the Proposed Transaction comes at a time when MobileIron's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

24.     Despite MobileIron's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

25.     On September 28, 2020, MobileIron issued a press release announcing the merger agreement:

**MobileIron to Be Acquired by Ivanti to Secure Every Endpoint and Power the Everywhere Enterprise**

September 28, 2020

***Transaction Creates World-Class Market Leader in Unified Endpoint Management, Zero Trust Security and Enterprise Service Management with Most Comprehensive Set of Solutions***

MOUNTAIN VIEW, Calif.--(BUSINESS WIRE)—MobileIron (NASDAQ: MOBL), the mobile-centric security platform for the Everywhere Enterprise, today announced that it has entered into an agreement to be acquired by Ivanti,

Inc., a leading provider of enterprise-grade intelligent IT management and security software solutions. Ivanti today also announced it has entered into an agreement to acquire Pulse Secure LLC, a leading provider of Secure Access and mobile security solutions to enterprise customers.

Under the terms of the agreement, Ivanti will acquire all outstanding shares of MobileIron common stock for a total value of approximately $872 million in cash. MobileIron stockholders will receive $7.05 in cash per share, representing a 27% premium to the unaffected closing price as of September 24, 2020. MobileIron's Board of Directors unanimously approved the transaction and believes the transaction will maximize stockholder value.

The "future of work" now means enabling a secure workforce for the "work from everywhere" world through a mobile-centric, zero trust security strategy. By bringing MobileIron and Pulse Secure into the Ivanti portfolio, organizations will be able to manage and secure users, devices, data, and access to ensure that every device in an organization is covered, while delivering a contextual personalized employee experience. The combined company will have the ability to enable and secure the Everywhere Enterprise. Additionally, customers will benefit from the expanded scale, corporate resources, service capabilities and financial flexibility that the transaction and combined hyper-automation platform will deliver. Upon completion of the transaction, the combined company will be led by Ivanti Chairman and CEO Jim Schaper.

"We are thrilled to join forces with Ivanti and Pulse Secure in a combination that will accelerate our ability to help organizations quickly and securely embrace the future of work, in which employees, IT infrastructures and customers are everywhere – and mobile devices provide access to everything," added Simon Biddiscombe, CEO of MobileIron. "Bringing together our solutions will enable organizations to easily secure users, devices, data and access in the Everywhere Enterprise and we're confident that this transaction will enable us to deliver comprehensive security for the next generation workforce, provide enhanced opportunities for our team of employees, and better serve our customer base. We're confident this combination represents the best path forward for our stockholders and MobileIron."

Backed by Clearlake Capital Group, L.P. and TA Associates Management L.P., the combined company's solutions will extend to all devices, making Ivanti the leading provider of Unified Endpoint Management (UEM), Enterprise Service Management (ESM), and Zero Trust security solutions – and the only company on the market that provides end-to-end coverage. The transaction will enable Ivanti to deliver the most comprehensive set of solutions to discover, manage, secure, and service every endpoint for the Everywhere Enterprise, in which employees, IT infrastructures and customers are everywhere — and mobile devices provide access to everything.

"By combining MobileIron and Pulse Secure with Ivanti, we are creating a leader in the large and growing Unified Endpoint Management, Security and Enterprise Service Management markets. We now have the most comprehensive set of software solutions that addresses the growing market demand for the future of work, where working from anywhere on any device type is the new normal," said Jim Schaper, Ivanti Chairman and CEO. "With the integration of our industry knowledge and complementary product offerings, Ivanti will be well positioned to provide our expansive customer base with the critical tools needed to tackle IT challenges in the new normal. We welcome MobileIron's and Pulse Secure's employees, customers, and partner network to the Ivanti family, and thank Clearlake and TA Associates for their strong support in enabling these transformational transactions."

"The Pulse Secure team is excited to join the Ivanti family in the next chapter of growth for the combined platform," added Sudhakar Ramakrishna, CEO of Pulse Secure. "We believe that organizations looking for Unified Endpoint Management and Secure Access solutions will see the combined platform as a new, highly focused partner with the capabilities to deliver a complete, best-in-class, global solution. We appreciate Siris Capital for their phenomenal support over the past six years, which enabled us to invest in our products, people, and clients in order to achieve a wonderful outcome for shareholders and find a great home."

**Transaction Highlights**

- Under the terms of the agreement with MobileIron, Ivanti will acquire all outstanding shares of MobileIron common stock for a total value of approximately $872 million. MobileIron stockholders will receive $7.05 in cash per share, representing a 27% premium to the unaffected closing price as of September 24, 2020.
- MobileIron's Board of Directors unanimously approved the deal and believes the transaction will maximize stockholder value.
- Morgan Stanley Senior Funding, Inc., BofA Securities, UBS Investment Bank, and BMO Capital Markets are providing debt financing for the acquisitions.
- The closing of the transaction is expected in late Q4, subject to approval by MobileIron stockholders and the satisfaction of regulatory and customary closing conditions.

**Advisors**

- Barclays acted as the exclusive financial advisor to MobileIron. Morrison & Foerster LLP acted as legal advisor to MobileIron.

**The Preclusive Deal Protection Devices**

26.    To the detriment of the Company's shareholders, the Individual Defendants agreed,

in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

27.     The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

28.     These no-shop provisions also require the Board to provide Ivanti written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Ivanti following receipt of the notice, so that Ivanti has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

29.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $30,450,000 with respect to any termination under the no-shop provision.

30.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

31.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial

intervention.

**The Proxy Omits Material Information**

32.     On or about October 14, 2020, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

33.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

>    **A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

34.     The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

35.     The Proxy fails to disclose (i) the identify of Company B, (ii) whether Company C's September 21, 2020 letter re-affirming its proposal to acquire MobileIron for $7.25 per share re-affirmed Company C's interest in acquiring MobileIron notwithstanding Company C simultaneously acquiring Company B, and (iii) how MobileIron "was informed" that Ivanti was acquiring Company B on September 23, 2020.

36.     The Proxy fails to disclose the identity of Company B.  Based on Ivanti's September 28, 2020 press release entitled *Ivanti, Backed by Clearlake Capital and TA Associates, Announces Strategic Acquisitions of MobileIron and Pulse Secure to Further Automate and Secure Endpoints*, it appears but cannot be certain that Company B is Pulse Secure LLC.  The identity of Company B and the plain disclosure of any possible connections or conflicts of interest between any

MobileIron insiders and Company B is obviously material to investors because Company C had indicated interest in acquiring MobileIron and Company B but withdrew its proposal to acquire MobileIron for $7.25 per share on the same day that MobileIron "was informed that Ivanti had agreed with the current owner of Company B to acquire Company B."

37.     Likewise, the Proxy fails to disclose whether the letter that Company C provided to re-affirm its proposal to acquire the Company for $7.25 per share on September 21, 2020 – just two days before Company C withdrew its proposal and a week before the Defendants agreed to the inadequate $7.05 Merger Consideration – also re-affirmed Company C's stated position on September 8, 2020 that Company C's proposal to acquire MobileIron for $7.25 per share was not contingent on also acquiring Company B.  Again, this information is unquestionably material to any reasonable investor because Company C withdrew its plainly superior proposal within days of re-affirming it and on the same day that MobileIron "was informed that Ivanti had agreed with the current owner of Company B to acquire Company B."

38.     Finally, the Proxy fails to disclose how MobileIron "was informed" that Ivanti would be acquiring Company B on September 23, 2020.  Again, this information is clearly material to any reasonable investor because Ivanti's acquisition of Company B appears to be a substantial factor  in Company C withdrawing its proposal to acquire MobileIron for $7.25 per share.

**B.     The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

39.     The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

40.     The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the

underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

41.     The Proxy fails to disclose the following items used to derive the Net Income and Unlevered Free Cash Flow projections: (i) General and administrative expenses, (ii) Stock-based compensation expenses, (iii) Change in net working capital, (iv) Depreciation and amortization, and (v) any other items used to derive these projections.  With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

42.     With respect to Barclays' *Selected Comparable Company Analysis* beginning on Page 42, the Proxy fails to disclose (i) the objective criteria that Barclays relied upon in deeming the selected companies "comparable" to the Company, (ii) the individual multiples for each of the selected companies, (iii) Barclays' full rationale and basis for selecting a 2020E Revenue multiple range of 3.00x to 4.25x and a 2021E Revenue multiple range of 2.75x to 4.00x, including which, if any, of the selected companies had substantial value tied up in NOLs and/or were projected to post positive earnings in 2020 and/or 2021.

43.     With respect to Barclays' *Selected Precedent Transaction Analysis* beginning on

Page 43, the Proxy fails to disclose: (i) the objective criteria that Barclays relied upon in deeming the selected transactions "relevant," (ii) the individual multiples for each of the selected transactions, and (iii) Barclays' full rationale and basis for selecting a range of 3.25x to 4.50x forward twelve-month revenue for the valuation of MobileIron, including the "qualitative judgments concerning differences between the characteristics of the selected precedent transactions" such as which, if any, of the precedent transactions involved companies with substantial value tied up in NOLs and/or projected to post positive earnings in the near future.

44.     With respect to Barclays' *Discounted Cash Flow Analysis* ("DCF") beginning on Page 44, the Proxy fails to: (i) fully disclose Barclays' rationale and basis for selecting discount rate ranges of 9.5% to 11.5%, (ii) fully disclose Barclays' rationale and basis for applying a range of EBITDA terminal multiples of 9.0x to 12.0x and/or a range of perpetuity growth rates of 3.0% to 4.5%, (iii) the method and discount rate Barclays employed to derive the "estimated present value of the NOLs" and whether the valuation would be different if the DCF applied NOLs to the projected cash flows rather than excluding them from the cash flows and basing them on estimated present value, and (iv)  provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.

45.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

*There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

46.     With respect to Barclays' *Equity Analyst Target Prices Analysis* beginning on Page 45, the Proxy fails to disclose (i) the source, dates, and amounts of the individual price targets, or at least (ii) provide a measure of central tendency that fairly summarizes the results of the analysis.

47.     With respect to Barclays' *Illustrative Leveraged Acquisition Analysis* beginning on Page 45, the Proxy fails entirely to disclose the rationale and basis underlying Barclays assumptions.

48.     With respect to Barclays' *Illustrative Transaction Premium Analysis* beginning on Page 45, the Proxy fails to disclose: (i) the individual transactions that were analyzed, including (ii) the individual premium in each transaction, and (iii) the implied valuation for the company acquired in the transaction, which includes companies that were acquired for as little as $250

million and as much as $5 billion, *i.e.,* or ranging from less than one third to almost six times the value implied by the Proposed Transaction.

49.     The Proxy also fails to disclose the amount of compensation that Barclays has received from "Ivanti's principal stakeholder and the other party that had entered into the Joinder." *See* Proxy at 46-47.   This information is crucial for investors to know whether Barclays had a significant conflict in issuing the fairness opinion that Defendants are urging the Company's public investors to rely on.

50.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.   With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).   Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

51.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure

of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

54.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

55.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

56.     Defendants have issued the Proxy with the intention of soliciting the Company's

common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

57.   In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

58.   The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified

above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

59. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

60. The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

61. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

62.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

64.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

66.     In addition, as the Proxy sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

67.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

69.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

    D.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 21, 2020                **MONTEVERDE & ASSOCIATES PC**

                                 By:   */s/ Juan E. Monteverde*
                                   Juan E. Monteverde (JM-8169)
                                   The Empire State Building
                                   350 Fifth Avenue, Suite 4405
                                   New York, NY 10118
                                   Tel:(212) 971-1341
                                   Fax:(212) 202-7880
                                   Email: jmonteverde@monteverdelaw.com

                                   *Attorneys for Plaintiff*


**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
       jfruchter@ademilaw.com

*Attorneys for Plaintiff*